UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Joseph S. Hajdusek,
      Plaintiff

      v.                                    Case No. 16-cv-340-SM
                                            Opinion No. 2017 DNH 198
United States of America,
      Defendant


                            **O R D E R**


      Joseph Hajdusek brings this action against the United

States of America seeking damages under the Federal Tort Claims

Act.  Hajdusek was injured while taking part in an exercise and

physical training regimen, as part of the United States Marine

Corps Delayed Entry Program ("DEP").  Hajdusek says his injuries

were proximately caused by a Marine Corps Staff Sergeant who

"excessively exercised [him] under dangerous conditions with

high intensity and long periods of time without breaks for

adequate hydration" and "carelessly, recklessly and negligently

failed to supervise [his] physical condition during the

excessive and unwarranted hours of strenuous physical exercise."

Complaint (document no. 1) at paras. 12 and 13.


      Pending before the court is the United States' motion to

dismiss, in which it asserts that this court lacks subject

matter jurisdiction over Hajdusek's claim because it arises out of the Staff Sergeant's performance of a discretionary function. See 28 U.S.C. § 2680(a).

## Standard of Review

When faced with a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff, as the party invoking the court's jurisdiction, bears the burden to establish by competent proof that such jurisdiction exists. See, e.g., Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). In determining whether that burden has been met, the court must "take as true all well-pleaded facts in the plaintiffs' complaint[], scrutinize them in the light most hospitable to the plaintiffs' theory of liability, and draw all reasonable inferences therefrom in the plaintiffs favor." Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). The court may also consider evidence the parties have submitted, such as depositions, exhibits, and affidavits, without converting the motion to dismiss into one for summary judgment. See, e.g., Carroll v. United States, 661 F.3d 87, 94 (1st Cir. 2011). Both parties have attached exhibits to their memoranda, which the court has considered.

## Background

In August of 2010, Hajdusek enrolled in the Marine Corps
Delayed Entry Program ("DEP"). He says he entered the DEP
rather than reporting directly to basic training because he "was
overweight and not in shape to pass basic training at that
time." Declaration of Joseph Hajdusek (document no. 14-1) at
para. 9. By way of background, the Marine Corps DEP has been
helpfully described as follows:

> The United States Marine Corps' delayed-entry program
> allows individuals to enlist in the Marine Corps
> Reserve for up to a year before enlisting in the
> regular Marine Corps. Individuals participating in
> the program, referred to as "poolees," are enlisted
> into the Marine Corps Reserve. When poolees finish
> the program, they are sent to recruit training (a.k.a
> "boot camp"), at which time they are discharged from
> the reserve component and enlisted onto active duty in
> the regular Marine Corps. The delayed-entry program
> helps the poolees prepare physically and mentally for
> the initial strength test and recruit training itself.
> The program also helps reduce the rate of attrition at
> recruit training, and assists in the training of the
> Marines.

Snow v. United States, No. 4:10-CV-319, 2012 WL 1150770, at *1
(E.D. Tex. Mar. 13, 2012) (citations omitted), report and
recommendation adopted, 2012 WL 1150765 (E.D. Tex. Apr. 5,
2012).

By January of 2011, Hajdusek says he had reached his target
weight and had almost reached his strength goals, so he was

instructed to report for basic training at Parris Island on or around February 7, 2011. Hajdusek Declaration at para. 13. But, because he developed a kidney stone, his entry was again delayed and he had to temporarily stop meeting with his fitness instructors. Later in February, however, Hajdusek resumed his training regimen. At that point, he says he had maintained his target weight and needed only to pass a pull-up test before he could proceed to basic training. Id. at para. 15. On March 1, 2011, Hajdusek reported for training exercises with the Marine recruiters. According to the complaint:

> Staff Sergeant Mikelo was working with [Hajdusek] that day for his training. Hajdusek and Staff Sgt. Mikelo had not met until March 1, 2011.
>
> During the training session on March 1, 2011, Staff Sgt. Mikelo excessively exercised [Hajdusek] under dangerous conditions with high intensity and long periods of time without breaks for adequate hydration.
>
> Staff Sgt. Mikelo of the United States Marines carelessly, recklessly and negligently failed to supervise [Hajdusek's] physical condition during the excessive and unwarranted hours of strenuous physical exercise.

Complaint at paras. 11-13. Hajdusek claims that although he passed the pull-up test, Sergeant Mikelo ordered him to continue exercising for an extended period of time (he believes Mikelo was punishing him for having missed an earlier poolee function due to a family commitment). He says that during the two-hour

4

training session, he was only given two brief breaks to run down the hall to get some water.  Id. at para. 20.  And, says Hajdusek, toward the end of the session, he was "clearly showing signs of exhaustion and over-exertion injuries" and says he collapsed on the floor several times while performing air squats.  Id. at 22.  But, he did not complain or stop exercising "because [he] did not want to anger S.Sgt. Mikelo further."  Id.

Four days later, Hajdusek says he couldn't see because his vision was blurry, he had difficulty moving, and he was nauseated.  Id. at para. 29.  He was taken to the hospital by ambulance, where he was diagnosed with "rhabdomyolysis, left lumbar radiculitis, L4-5 bilateral facet spondylosis, muscle imbalances with biomechanical deficits, gait abnormality, kidney failure, and significant pain."  Id.  In August of 2011, he began receiving Social Security disability benefits and says he has lost the ability to work a normal schedule and lives in constant pain.  Id. at para. 31.  He asserts that his injuries were proximately caused by Staff Sergeant Mikelo's careless, reckless, and negligent actions in conducting (and supervising) Hajdusek's training regimen.

Parenthetically, the court notes that when Hajdusek was injured, he was a member of the United States Marines Ready

Reserve.  Accordingly, the parties seem (implicitly) to agree that his claim is not barred by the <u>Feres</u> doctrine.  <u>See</u> <u>Feres v. United States</u>, 340 U.S. 135 (1950) (barring members of the military from suing the United States for injuries arising during service in the military).  <u>See also</u> Command Order 7000.3 (document no. 15-1) at para. 4(b)(8) ("Since poolees are not eligible for DoD type benefits and they do not fall under the <u>Feres</u> Doctrine, they may file claims or suits against a Marine, the Recruiting Command or the Marine Corps for negligence."); Hajdusek's Enlistment Papers (document no. 18-2) at 2 ("I understand that I am in a nonpay status and that I am not entitled to any benefits or privileges as a member of the Ready Reserve.").

As noted above, Hajdusek's sole claim against the United States is brought pursuant to the Federal Tort Claims Act.

**Discussion**

I.   <u>The FTCA and the Discretionary Function Exception</u>.

The Federal Tort Claims Act is a limited waiver of the federal government's sovereign immunity.  Federal district courts exercise subject matter jurisdiction over civil actions for monetary damages against the United States.  28 U.S.C. § 1346(b)(1).  Specifically, the FTCA allows civil actions against

the United States for the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Id. Critically, however, the FTCA also contains what is known as the "discretionary function exception." That exception provides that the general waiver of sovereign immunity established in the FTCA shall not apply to:

> Any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis supplied). Consequently, if the discretionary function exception applies, Hajdusek's claim against the United States is not within the scope of the FTCA, and this court lacks subject matter jurisdiction over it. See generally Abreu v. United States, 468 F.3d 20, 25 (1st Cir. 2006) ("Thus, if the discretionary function exception applies, the jurisdictional grant of section 1346(b) does not, such that the government is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction.") (citations and internal punctuation omitted). See also Santana-

Rosa v. United States, 335 F.3d 39, 42 (1st Cir. 2003) ("Proper invocation of this exception means that the government will be shielded from liability, no matter how negligently an employee may have acted.") (citation omitted).

To determine whether challenged conduct falls within the scope of the discretionary function exception, courts must engage in a two-part inquiry:

> [W]e first ask whether the conduct itself is discretionary. To be discretionary, the conduct must involve an element of judgment or choice.
>
> Assuming that the challenged conduct involves an element of judgment, we next consider whether that judgment is of the kind that the discretionary function exception was designed to shield. In other words we ask whether the exercise of discretion involves (or is susceptible to) policy-related judgments.

Abreu, 468 F.3d at 25-26 (citations and internal punctuation omitted). See also Fothergill, 566 F.3d at 252. And, as the Supreme Court has held, "when established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324 (1991). Under those circumstances, the plaintiff "must overcome the Gaubert presumption by showing that [the

government agent's] actions were not susceptible to policy analysis." Dwyer v. United States, 76 F. Supp. 2d 154, 159 (D.N.H. 1999) (citing Shansky v. United States, 164 F.3d 688, 692 (1st Cir. 1999) and Irving v. United States, 162 F.3d 154, 168 (1st Cir. 1998)).

II.  Hajdusek's Arguments.

Hajdusek asserts that the FTCA's discretionary function exception does not apply in this case for two reasons.  First, he says Sergeant Mikelo's conduct was not discretionary. Instead, he claims "there appear to be regulations, Orders, and guidelines that were specifically violated, taking this [case] out of the 'discretionary' category altogether."  Plaintiff's Memorandum at 8.  Second, Hajdusek asserts that even if Sergeant Mikelo's conduct can properly be viewed as discretionary, it did not involve the kind of judgment that the discretionary function exception is designed to shield.  That is, it did not involve "the permissible exercise of policy judgment."  Id. at 11 (citing Berkovitz v. United States, 486 U.S. 531, 537 (1988)).

A.  Discretionary Conduct.

As a basic matter, it probably bears noting that if a statute, regulation, or policy mandates that a government employee engage in specific conduct, that employee is not vested

with discretion to ignore that mandate – he or she must comply with its dictates. See, e.g., Gaubert, 499 U.S. at 322 ("The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow because the employee has no rightful option but to adhere to the directive.") (citations and internal punctuation omitted). On the other hand, if no statute, regulation, or policy specifically prescribes the employee's course of action, and if the employee is "free to decide what course of action he will take in a given situation, then his conduct is discretionary." Dwyer, 76 F. Supp. 2d at 158 (citations omitted).

Here, Hajdusek points to the Pool Program Rules (document no. 15), Marine Recruiting Command Order 7000.3 (document no. 15-1), The Guidebook for Recruiters (document no. 14-2), and various other policy guides and manuals relating to the poolee program and suggests that they mandate specific conduct and establish certain protocols – protocols that were violated in this case. For example, Hajdusek asserts that:

> [S]upporting the argument that the alleged acts at issue violated these regulations or prohibitions is paragraph 8 of [Marine Recruiting Command Order 7000.3], warning that injuries to poolees should be avoided because as civilians they may sue under the FTCA, and specifically mandating that "due care must

be taken to avoid potential liability." That very
paragraph warns that regardless of other determining
factors, "high-risk pool functions will be . . . above
all SAFE." Indeed, Command Order 7000.3 mandates that
the training be weighed as risk vs. merits, and must
be conducted in a "productive, safe manner, injury
free and void of liability claims." Pages 4 and 5 of
that same Order list numerous activities as high-risk,
many of which are far less risky compared to the
forced excessive exercise alleged in this case.

Plaintiff's Memorandum at 9 (citations omitted). Similarly,

Hajdusek points to the Pool Program Rules, which note that "Any

poolee event or activity that presents the real possibility of

serious injury should not be undertaken. It is important to

remember that poolees are not Marines yet and special care

should be taken to prevent even the slightest possibility of

injury." Id. at 5-C-14. He also relies upon a paragraph from

The Guidebook for Recruiters, which states: "Treat poolees

professionally; do not establish a Drill Instructor to recruit

relationship. Strive for a relationship similar to that of a

teacher and student." Id. at 3. According to Hajdusek,

Sergeant Mikelo violated those (and similar) directives when he

failed to conduct his training regimen in a safe manner and used

drill instructor-type tactics while training Hajdusek. The

court is constrained to disagree.

The Command Orders and DEP guidelines cited by Hajdusek are

not mandatory. Instead, they are instructional and

aspirational.  For example, as Hajdusek acknowledges in his memorandum, Command Order 7000.3 notes that each instructor "must weigh the merits versus the risks [associated with a particular 'high risk' activity] and determine, before requesting approval, that high-risk functions will be conducted in a productive, safe manner, injury free and void of liability claims."  Id. at para. 4(b)(8).[1]  Plainly, that directive contemplates that each instructor will exercise discretion when he or she: considers which specific activities the poolee will undertake; assesses the degree to which any benefit to the poolee might be outweighed by the risk of injury; and decides precisely how those activities will be conducted.  Neither that Command Order nor any of the other orders and directives cited by plaintiff mandate particular training programs, nor do they address the frequency, length, or intensity of specific physical training exercises.  They are, instead, general guidelines, issued to encourage instructors to be aware of (and account for)

---

[1]    It is not entirely clear whether Command Order 7000.3 actually applies in this instance.  That document provides guidance on obtaining funding for, and conducting, DEP functions.  Those provisions on which Hajdusek relies relate to "high risk pool activities," which are defined to include activities that carry the "potential for moderate to serious injury," including things like white-water rafting, rappelling, running obstacle courses, and firing weapons.  Id. at para. 4(b)(8).  Nothing in the record suggests that those provisions apply to the type of exercise regimen in which Hajdusek participated - that is, one involving running, push-ups, squats, lunges, and crunches.

safety issues and to assist them in fashioning customized programs that will prepare each individual poolee for the rigors of basic training.  See, e.g., Guidebook for Recruiters at 5-5 ("Based on the poolee profile, tailor a program and set specific goals for the poolee to accomplish while in the Pool Program, (e.g., referrals, physical fitness and/or weight loss);" Pool Program Rules at 13 of 26 ("Pool activities geared toward physical conditioning should concentrate on developing the following areas: (a) upper body strength; (b) abdominal strength; (c) aerobic conditioning."); Command Order 7000.3 at 3 (providing that if an instructor chooses to engage his or her poolees in "high-risk pool functions," the instructor must exercise discretion to balance the need to avoid injury, with the goal that such events be "well thought out, exciting, [and] challenging.").  See generally Snow v. United States, 2012 WL 1150770, at *3 ("the Marine Corps orders that Plaintiffs assert were violated do not prescribe a specific course of action. Instead, these orders appear to formulate guidelines to best allow individuals to make well-reasoned, informed decisions, at their discretion.").

But, says Hajdusek, "matters of scientific and professional judgment - particularly judgments concerning safety - are rarely considered to be susceptible to social, economic, or political

policy." Plaintiff's Memorandum at 20 (quoting Whisnant v.

United States, 400 F.3d 1177, 1181 (9th Cir. 2005)).  To the

extent that view of the discretionary function exception was not

implicitly rejected in Boyle v. United Techs. Corp., 487 U.S.

500 (1988), it has been explicitly rejected in this circuit.

See, e.g., Shansky, 164 F.3d at 693 ("[T]here is no principled

basis for superimposing a generalized 'safety exception' upon

the discretionary function defense.  A case-by-case approach is

required."); Dwyer, 76 F. Supp. 2d at 160 ("In the absence of a

specific, established safety policy, the First Circuit has

rejected a general 'safety exception' to the discretionary

function.").


    In short, the various general expressions of concern for

poolee safety identified by Hajdusek do not, whether alone or in

combination, constitute a mandatory policy governing how

instructors must organize, execute, or supervise fitness

training programs for poolees.  Consequently, it cannot be said

that Sergeant Mikelo "violated" any of those aspirational policy

statements.  As the Shansky court observed:


        Shansky endeavors to end the inquiry at the initial
        stage by showing that the Park Service had no
        discretion because existing policy mandated that it
        install handrails and warning signs when it
        refurbished the premises.  She finds succor in a
        broadly worded expression of a general policy goal

contained in the Park Services operating manual to the
effect that "[t]he saving of human life will take
precedence over all other management actions."
National Park Service, NPS-28: Cultural Resource
Management Guidelines (Guidelines) 46 (July, 1994).
But this passage does not specifically prescribe that
any particular safety measure be employed at any
particular place or in any particular facility. To
the contrary, it suggests that the Park Service and
its functionaries will have to make discretionary
judgments about how to apply concretely the
aspirational goal embedded in the statement.
Statements made at this level of generality do not
satisfy Gaubert's and Berkovitz's specific
prescription requirement. Were the law otherwise, the
discretionary function exception would be a dead
letter.

Shansky, 164 F.3d at 691 (citation and footnote omitted)

(emphasis supplied). So it is in this case.


Based upon the record before the court, it is plain that

the conduct at issue in this case - Sergeant Mikelo's decision

to subject Hajdusek to a series of strenuous exercises and his

alleged failure to adequately monitor Hajdusek's condition -

involved elements of judgment and discretion. The question is

not whether Mikelo was negligent, or whether he exercised poor

judgment, or whether he abused his discretion. It is, rather,

whether he was vested with discretion to formulate and supervise

a unique exercise program to help Hajdusek reach (and maintain)

his personal weight and fitness goals. He was.

Next, the court must consider whether that discretion is of the kind that the discretionary function exception was designed to shield – that is, whether Sergeant Mikelo's exercise of discretion involved or was susceptible to policy-related judgments.  See Abreu, 468 F.3d at 25–26.  See also Gaubert, 499 U.S. at 323 ("[W]hen properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'") (quoting Berkovitz, 486 U.S. at 537).

B.   Policy Judgment.

Because Sergeant Mikelo was vested with a range of discretion to determine the most appropriate way to assist Hajdusek in reaching his weight, strength, and stamina goals before reporting for basic training, "it must be presumed that [his] acts [were] grounded in policy when exercising that discretion."  Gaubert, 499 U.S. at 324.  Consequently, for Hajdusek's complaint to survive the government's motion to dismiss, "it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."  Id. at 324–25.

At this stage of the court's analysis, the focus is not on Sergeant Mikelo's subjective intent in exercising the discretion

with which he was vested, nor need the court determine whether
he actually engaged in any policy-based decision-making when
formulating and overseeing Hajdusek's exercise regimen.
Instead, the court must focus "on the nature of the actions
taken and on whether they are susceptible to policy analysis."
<u>Gaubert</u>, 499 U.S. at 325.  As the Court of Appeals for the First
Circuit has observed:

> In fine, an inquiring court need not ask whether
> government actors decided the point explicitly or
> actually discussed it, for the inquiry hinges instead
> on whether some <u>plausible policy justification</u> could
> have undergirded the challenged conduct.  The critical
> question is whether the acts or omissions that form
> the basis of the suit are <u>susceptible to a policy-
> driven analysis</u>, not whether they were the end product
> of a policy-driven analysis.

<u>Shansky</u>, 164 F.3d at 692 (citation and footnote omitted)
(emphasis supplied).


The record is clear that instructors in the DEP, like
Sergeant Mikelo, must routinely balance poolee safety concerns
with various other interests, including:

> (a)  adequately preparing poolees for the physical and
> mental rigors of both basic training and life as
> a United States Marine, <u>see, e.g.</u>, Pool Program
> Rules at 5-C-11 ("Too much training time is lost
> and too many prospective Marines are discharged
> because they arrive at recruit training
> overweight and/or without the minimum levels of
> strength and endurance."); Guidebook for

Recruiters (document no. 14-2) at 5-4 ("You must
ensure that the poolee can pass the IST [Initial
Strength Test] prior to shipping.");

(b) reducing attrition in the DEP and at basic
training, <u>see</u> Pool Program Rules at 5-C-1;

(c) appropriately utilizing finite military
resources, <u>see, e.g.</u>, Command Order 7000.3
(setting forth detailed instructions for
obtaining and using appropriated funds for DEP
functions and training events);

(d) fostering in the poolees a sense of loyalty,
camaraderie, structure, and discipline, <u>see,
e.g.</u>, Guidebook for Recruiters at 5-10 ("Organize
the pool into Rifle Squads with squad and fire
team leaders. . . . This teaches the poolee
military organization and structure."); and

(e) generating new recruit referrals from the
poolees, <u>see, e.g.</u>, Guidebook for Recruiters at
5-2 (noting that one of the goals of the Pool
Program is to "get poolees to refer names of
qualified prospects" and then to have those
"prospects enlist in the Marine Corps.").

<u>See also</u> Declaration of Jack Jacobs, Jr. (document no. 8-2)

(discussing the various goals of the Marine Corps Recruiting

Command and the Delayed Entry Program that must be considered

and balanced when designing individualized fitness programs for

poolees). <u>See generally</u> <u>Snow</u>, 2012 WL 1150770, at *3 ("[T]he

decisions made regarding the training exercises balance the need

for the safety of the poolees with the necessity of conserving

scarce military resources, and the need to prepare young men and

women to succeed in boot camp, reduce attrition rates, and make

better Marines.").

The discretionary judgments at issue in this case are
precisely the type that courts have recognized as involving
policy-based considerations, as they require "judgment as to the
balancing of many technical, military, and even social
considerations, including specifically the trade-off between
greater safety and greater combat effectiveness." Boyle, 487
U.S. at 511. See generally, Santana-Rosa, 335 F.3d at 43–44
(concluding that the bureau of prisons' "decisions regarding
maintenance of cleaning supplies and inmate work assignments are
susceptible to policy-related analysis" and necessitate
consideration of several factors, such as "budgetary concerns,
sanitation needs, the character of the particular inmate
population, the need for a specific level of security, the
proper scheduling of cleaning assignments, the convenience or
necessity of easy access to necessary equipment, and the
available inmates' prior work experience."). See also Shansky,
164 F.3d at 694–95 (noting that deciding whether to install
safety handrails at a national historic site "required the
unrestrained balancing of incommensurable values — including
safety, aesthetics, and allocation of resources — typically
associated with policy judgments.); Fothergill, 566 F.3d at 253
(holding that the United States Postal Service's decision about
"whether to install curbs or barriers in a parking lot, when to
do so, how to array them, and the like are variables about which

reasonable persons can differ.  In the last analysis, those choices are informed by a need to balance concerns about a myriad of factors such as efficiency, safety, aesthetics, and cost.  In other words, those choices are readily susceptible to policy analysis. . . . So long as there is room for differing policy judgments, there is discretion of the type and kind shielded by section 2680(a)").

## Conclusion

The conduct at issue in this case – a Marine Corps recruiter's allegedly negligent conduct in formulating an exercise regimen for Hajdusek, and his allegedly negligent failure to properly monitor Hajdusek as he performed that exercise regimen – was discretionary and involved (or was, at a minimum, susceptible to) the exercise of policy-related judgment.  Consequently, the discretionary function exception to the Federal Tort Claims Act applies to Hajdusek's claim against the United States and this court lacks subject matter jurisdiction over it.

For the foregoing reasons, as well as those set forth in the government's memoranda, the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (document no. 8) is

granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 21, 2017

cc:   David N. Damick, Esq.
      Thomas P. Colantuono, Esq.
      Robert J. Rabuck, AUSA